Slip Op. 07 - 106

UNITED STATES COURT OF INTERNATIONAL TRADE

```
- - - - - - - - - - - - - - - - - - - -x
MITTAL STEEL POINT LISAS LIMITED,      :

                       Plaintiff,      :

          v.                           :
                                          Court No. 02-00756
UNITED STATES,                         :

                       Defendant,      :
          -and-
                                       :
GERDAU AMERISTEEL CORP. et al.,
                                       :
               Intervenor-Defendants.
- - - - - - - - - - - - - - - - - - - -x
```

Memorandum

[Results of remand to International Trade
 Commission pursuant to mandate of Court of
 Appeals for the Federal Circuit affirmed.]

Decided: July 6, 2007

Steptoe & Johnson LLP (Mark A. Moran, Matthew S. Yeo and Evangeline D. Keenan) for the plaintiff.

James M. Lyons, General Counsel, Andrea C. Casson, Assistant General Counsel, and Jonathon J. Englar, U.S. International Trade Commission, for the defendant.

Kelley Drye Collier Shannon (Paul C. Rosenthal, Kathleen W. Cannon and R. Alan Luberda) for the intervenor-defendants.

AQUILINO, Senior Judge: Before this court are the January 16, 2007 Views of the U.S. International Trade

Commission ("ITC")[1] issued pursuant to the order of remand filed herein, 30 CIT ___, Slip Op. 06-151 (Oct. 13, 2006), in conformity with the mandate of the U.S. Court of Appeals for the Federal Circuit ("CAFC") that the commissioners

> "make a specific causation determination and in that connection . . . directly address whether [other LTFV imports and/or fairly traded imports] would have replaced [Trinidad and Tobago's] imports without any beneficial effect on domestic producers."

Caribbean Ispat Ltd. v. United States, 450 F.3d 1336, 1341 (Fed.Cir. 2006), quoting from Bratsk Aluminum Smelter v. United States, 444 F.3d 1369, 1375 (Fed.Cir. 2006). These Views report that,

> [u]pon consideration of the court's remand instructions, we determine . . . that an industry in the United States is not materially injured or threatened with material injury by reason of imports of certain wire rod from Trinidad and Tobago that is sold in the United States at less than fair value ("LTFV").[2]

           *    *    *

   [2] Commissioners Stephen Koplan and Charlotte R. Lane dissent, but join in Sections I, II and III of these remand views. As further set forth in their *Separate and Dissenting Views*, they find that an industry in the United States is materially injured by reason of subject imports from Trinidad and Tobago.

---

   [1] These Views will be cited hereinafter as "Remand Results".

Counsel for the U.S. domestic industry respond herein to these Views, in part, as follows:

> In sum, the Commission has clearly indicated its belief that the appellate court's holdings in both Bratsk and Caribbean Ispat are contrary to law, a conclusion with which the domestic producers concur. Despite or perhaps because of this disagreement, the Commission has adopted an extreme interpretation of the Court's holding, including reliance on a commodity-product finding the appellate court did not make, reliance on a rebuttable presumption the appellate court did not require, cumulation of all imports in its replacement analysis, a presumption that replacement of imports automatically negated benefits, and finally extension of the replacement/benefit test to the threat context. The result of this extreme interpretation of the Bratsk decision was to deprive the domestic industry of an antidumping duty order against Trinidad that the Commission believes should lawfully remain in effect.

Defendants-Intervenors' Comments, p. 26.

This court accepts this response as a plea for relief from the above-quoted controlling viewpoint, but its consideration thereof is circumscribed by the CAFC's specific mandate. See, e.g., Briggs v. Pennsylvania R.R. Co., 334 U.S. 304, 306 (1948), citing Himley v. Rose, 9 U.S. (5 Cranch) 313 (1809).

I

The ITC is required to make a final determination of whether a domestic industry is materially injured, or is threatened with material injury, by reason of imports, or sales

Court No. 02-00756                                                      Page 4

(or likelihood of sales) for importation. 19 U.S.C. §1673d(b)(1). It is well-established that an affirmative determination entails two elements: present material injury, or threat thereof, and a finding that that material injury is "by reason of" subject imports. See, e.g., Gerald Metals, Inc. v. United States, 132 F.3d 716, 719 (Fed.Cir. 1997); Chaparral Steel Co. v. United States, 901 F.2d 1097, 1104 (Fed.Cir. 1990); American Spring Wire Corp. v. United States, 8 CIT 20, 22-23, 590 F.Supp. 1273, 1276 (1984), aff'd sub nom. Armco, Inc. v. United States, 760 F.2d 249 (Fed.Cir. 1985).[2] In making such determinations, the Commission is required by 19 U.S.C. §1677(7)(B)(i) to consider

> (I)   the volume of imports of the subject merchandise,
> (II)  the effect of imports of that merchandise on prices in the United States for domestic like products, and
> (III) the impact of imports of such merchandise on domestic producers of domestic like products . . ..

Additionally, it "may consider such other economic factors as are relevant to the determination regarding whether there is

---

[2] This matter focuses at this time on the second element, *i.e.*, whether the domestic producers' present material injury has been "by reason of" subject imports from the Republic of Trinidad and Tobago ("RTT").

material injury by reason of imports." 19 U.S.C. § 1677(7)(B)(ii).

The subject imports at issue in this case are steel wire rods produced in RTT, a designated beneficiary country under the Caribbean Basin Economic Recovery Act ("CBERA"). That act, the purpose of which is to "promote economic revitalization and facilitate expansion of economic opportunities in the Caribbean Basin region," Pub. L. No. 98-67, 97 Stat. 384 (Aug. 5, 1983), modifies otherwise applicable 19 U.S.C. §1677(7)(G)(i), which requires the ITC to "cumulatively assess the volume and effect of imports of the subject merchandise from all countries" with respect to which petitions were filed or investigations initiated on the same day and such imports compete with each other and with domestic like products in the U.S. market. In making an injury determination with regard to imports from a CBERA designated nation, however, the Commission may assess the volume and effect of imports cumulated only with imports of the subject merchandise from other such designated beneficiary countries. See 19 U.S.C. §1677(7)(G)(ii)(III).

### A

In its original motion for judgment upon the agency record, the plaintiff claimed that the ITC majority failed to

"ensure that imports from Trinidad and Tobago *by themselves* made a material contribution to any injury to the domestic industry" and that the Commission "failed to explain how it ensured that it was not attributing . . . injury from th[o]se other known and potential sources of injury (*e.g.*, other subject and non-subject imports)". The plaintiff proposed that this court order the defendant to

> provide an adequate explanation as to how it ensured that it did not attribute the effects of other subject and non-subject imports to imports from the Republic of Trinidad and Tobago[.]

According to the Uruguay Round Agreements Act Statement of Administrative Action ("URAA-SAA"), in performing its "by reason of" analysis, the ITC should

> examine all relevant evidence, including any known factors, other than dumped [or subsidized] subject imports which at the same time are injuring the domestic industry[.]

Caribbean Ispat Ltd. v. United States, 29 CIT ___, ___, 366 F.Supp.2d 1300, 1305 (2005), quoting Defendant's Opposition Brief, p. 11, quoting H.R. Doc. No. 103-316, vol. 1, p. 851 (1994)(brackets in original). On plaintiff's subsequent appeal, however, the CAFC opined that reliance on this text read

> too much into the URAASAA's brief discussion of causation. First, the passage does not speak to the unique circumstances of CBERA or other non-cumulation

> provisions. Second, we do not regard the above-quoted passage as Congress's comprehensive and exclusive interpretation of section 1677(7)(B)(ii). The passage does not specifically reference that statute, and the plain language of section 1677(7)(B)(ii) suggests a broad grant of discretion in materiality determinations that allows the Commission to "consider such other economic factors as are relevant." . . . In the present case, the Commission had authority to treat LTFV imports from non-CBERA countries as an "other economic factor," just as the Commission ordinarily treats fairly traded imports as an "other economic factor" in dumping investigations that do not involve CBERA countries.

Caribbean Ispat Ltd. v. United States, 450 F.3d at 1339. Next, the CAFC addressed a contention by the plaintiff/appellant that legal error was committed by the ITC because it did not evaluate the effect of RTT's imports in light of other LTFV imports, and its findings did not discuss the effect of fairly-traded imports. The CAFC concurred with the contention – in the light of its then-recent decision in Bratsk Aluminum Smelter v. United States, supra, which explained that,

> [w]here commodity products are at issue and fairly traded, price competitive, non-subject imports are in the market, the Commission must explain why the elimination of subject imports would benefit the domestic industry instead of resulting in the non-subject imports' replacement of the subject imports' market share without any beneficial impact on domestic producers.

450 F.3d at 1341, quoting 444 F.3d at 1373. Whereupon the CAFC's above-quoted mandate to this court and the Commission issued.

II

On remand, the ITC again finds that the "volume of subject imports . . . is significant"[3]; that

> there has been significant price underselling by subject imports from Trinidad and Tobago as compared with the price of domestic like product, and that the effect of the subject imports was to prevent price increases which otherwise would have occurred, to a significant degree[;][4]

that the subject imports from RTT "alone were having a significant adverse impact on the domestic industry"[5]; and that there was "a likelihood of continued imminent injury to the domestic industry from subject imports from Trinidad and Tobago"[6]. Nonetheless, two commissioners arrived at a negative determination "<u>solely</u> as a consequence of [their] application of the additional 'replacement/benefit' analysis set forth by the [CAFC]".[7]

---

[3] Remand Results, p. 13.

[4] <u>Id</u>. at 18.

[5] <u>Id</u>. at 21.

[6] <u>Id</u>. at 25.

[7] <u>Id</u>. at 5 (emphasis added). Chairman Pearson did not participate in the remand determination. Commissioner Okun's negative determination continues to be based on failure to find significant volume or price effects from RTT subject imports. <u>See</u> <u>id</u>. at 2 n. 3.

As recited above, Commissioners Koplan and Lane dissented,

(footnote continued)

Court No. 02-00756                                                    Page 9


A

In applying the Bratsk analysis as laid out by the CAFC, at least those two commissioners take the language "the Commission must explain why the elimination of subject imports would benefit the domestic industry" to be the court's "creation of a presumption in favor of finding replacement", to wit:

> . . . The effect of the replacement/benefit test mandated by the Federal Circuit's decision seems to require the agency to render a negative determination, if the triggering factors are satisfied, unless the record contains substantial evidence that either non-subject imports would not replace the subject imports or that such replacement would nonetheless benefit the domestic industry.  This, in effect, requires proving the negative.  Put otherwise, it creates a rebuttable presumption that replacement will occur.

Remand Results, p. 30.  They go on to point out that the data needed to rebut such a presumption would need to be obtained from countries not under investigation, producers with no incentive to provide the data needed.  Indeed, such producers would have incentive to withhold information as an antidumping-

---

> finding that the first triggering factor for the *Bratsk* "replacement/benefits" analysis is not present in this remand determination.  Therefore, they dissent from any further analysis of *Bratsk* in this remand determination.

Id. at 5 n. 11.

duty order against the subject producers could be to their economic advantage. See id. at 30-31. As for the intervenor-defendants, they address this issue in the following manner:

> Application of a rebuttable presumption against the domestic industry, parties clearly not in possession of information on foreign capacity, pricing, etc., is unlawful. Longstanding case law establishes that the "burden of production {belongs} to the party in possession of the necessary information." Zenith Elecs. Corp. v. United States, 988 F.2d 1573, 1583 (Fed. Cir. 1993). See also Koyo Seiko Co. v. United States, 92 F.3d 1162, 1166 (Fed. Cir. 1996)("The burden of production is appropriately placed on the party deemed to control the information."). Further, the Commission is prohibited from drawing adverse inferences – which it effectively has done here against the U.S. producers – where parties have not been shown to have failed to cooperate to the best of their ability. See Shandong Huarong Machinery Co., Ltd. v. United States, 435 F. Supp. 2d 1261, 1272 (Ct. Int'l Trade 2006).

Defendants-Intervenors' Comments, pp. 13-14.

Whatever the effect of compliance with the CAFC's mandate, this court cannot conclude that the commissioners failed to address the question(s)[8] imposed by it. But they do

---

[8] As explained by the CAFC herein, a factor that triggers Bratsk analysis is where "commodity products are at issue". 450 F.3d at 1341, quoting 444 F.3d at 1373. What seemingly

(footnote continued)

clearly state that the Bratsk test is "**Unclear**"[9] and engenders

> ambiguities [that] arise in large part because the
> requirement imposed by the *Bratsk* panel . . . is not
> among the statutory factors Congress has required the
> Commission to consider.  Indeed, such a test
> misconstrues the purpose of the statute, which is not
> to bar subject imports from the U.S. market or award
> subject import market share to U.S. producers, but is
> meant instead to "level[] competitive conditions" by

---

triggered the mandate of such analysis now is that court's recitation of the ITC's finding of a

> "high level of fungibility between subject imports
> from Trinidad and Tobago and the domestic product, and
> between subject imports from Trinidad and Tobago and
> imports from each of the other subject countries."

450 F.3d at 1341.

Whereupon two commissioners in the majority report that they "feel constrained to interpret the Court's ruling broadly for purposes of satisfying the Court's remand in this case" and thus "conclude that this 'antidumping investigation is centered on a commodity product' that is 'generally interchangeable regardless of its source.'"  Remand Results, p. 36 (footnote omitted).  The dissenting opinion of two other commissioners states, on the other hand, that

> the domestic like product, subject imports, non-
> Trinidadian subject imports, and non-subject imports
> of wire rod are not "generally interchangeable
> regardless of its source" and consequently are not
> commodity products for purposes of the Bratsk
> analysis.  [He]nce this threshold Bratsk triggering
> factor is not met[.]

Id. at 50.  See also footnote 7, supra.

[9] Id. at 27 (boldface in original).

>   imposing a duty on subject imports and thus enabling
>   the industry to compete against fairly traded imports.
>   The statutory scheme in fact contemplates that subject
>   imports may remain in the U.S. market after an order
>   is imposed and even that the industry afterwards may
>   continue to suffer material injury. Indeed, the
>   dumping of subject imports may have no impact on
>   respective market shares, but may affect the domestic
>   industry's selling price and profitability alone.
>   Therefore, the Commission is required under *Bratsk* to
>   determine whether non-subject imports would fill the
>   void created by the "elimination" of subject imports
>   despite the fact that there may be no such void
>   created by an order.

Remand Results, pp. 28-29 (footnotes omitted). Nonetheless, they report, in pertinent part, as follows:

>   During the period of investigation, from 1999 to
>   2001, steel wire rod was produced in 41 countries.
>   With respect to non-Trinidadian subject imports, the
>   record indicates that producers in the six countries
>   collectively had sufficient excess capacity in 2001
>   . . . to more than replace Trinidadian exports to the
>   United States of 355,089 short tons.
>
>   . . . The main non-subject sources of wire rod in the
>   U.S. market over the period of investigation are
>   Turkey, Japan, and Germany. Turkey's production
>   capacity in 2000 . . . [was not fully utilized].
>   Japan was the world's third largest non-Trinidadian
>   producer of wire rod in 2000, producing approximately
>   7.9 million short tons, of which 16 percent was
>   exported worldwide during 1999 and 2000 combined,
>   years for which data were available. Japanese exports
>   to the United States decreased by 15.0 percent during
>   the period of investigation, and appear to have been
>   concentrated in the higher-end wire rod products.
>   Germany was the world's fourth-largest non-Trinidadian

producer of wire rod in 2000, exporting very large quantities of wire rod to many countries during the period of investigation, with exports accounting for 43.4 percent of domestic production in 2000. Public data show German production of about 6.8 million tons in 2000, and the Commission's data show excess capacity . . . in 2001. China was the world's largest producer of wire rod in 2000, with production of 29 million short tons, although a relatively small exporter of wire rod to the United States during the POI. There is some evidence that China would have had the ability to export additional wire rod products to the United States during the period of investigation, given planned increases in its domestic production capacity during the period and the rapid trajectory of its growth in wire rod exports to the United States from 1999 to 2001. This is consistent with the existence of unused non-subject capacity to supply the U.S. market. . . .

Taken together, the record with respect to production, unused production capacity, and export orientation of the producers in the aggregate in the non-Trinidadian countries provides ample evidence that such producers <u>could</u> have, if so inclined, exported sufficient volumes to the United States during the POI to fully replace subject imports from Trinidad. Absent any evidence that these producers would not have acted in such a manner, we are unable to find that imports from such producers would not have replaced subject imports from Trinidad and Tobago in the U.S. market, either by using unutilized capacity or by diverting exports from other markets. . . .

Regarding the benefit to the domestic industry, we note that we lack the type of pricing data for many non-subject products that we would normally use to analyze this factor, and are forced to rely partially on average unit values as a consistent unit of measurement. The situation with respect to pricing is mixed. For the foreign sources for which we have product-specific pricing data . . . the pricing data

>   show numerous instances in which other imports oversold imports from Trinidad and Tobago, but also numerous instances in which other imports undersold imports from Trinidad and Tobago. . . .
>
>   The underselling and low average unit values for many non-Trinidadian imports, considered in light of the apparent ability of numerous subject and non-subject wire rod producers to divert additional wire rod to the U.S. market, and the large number of foreign producers producing the [type of] wire rod in which Trinidadian shipments were concentrated, leaves us unable to conclude that non-subject and non-Trinidadian subject imports would not have replaced imports from Trinidad and Tobago in the U.S. market during the period of investigation, had Trinidad and Tobago been excluded from the market. Given the low prices or average unit values at which many of these imports entered the United States, we cannot conclude that non-subject and non-Trinidadian subject imports would not have replaced imports from Trinidad and Tobago and negated the benefit to the domestic industry of the exclusion from the market of an AD order on the subject imports.

Id. at 37-42 (footnotes omitted; emphasis in original).

### III

In view of the foregoing, it cannot be said that the defendant has not carried out the CAFC mandate to

>   make a specific causation determination and in that connection . . . directly address whether [other LTFV imports and/or fairly traded imports] would have replaced [Trinidad and Tobago's] imports without any beneficial effect on domestic producers.

Nor can this court conclude that the agency record, such as it still is, does not support the above-quoted specific causation

determination.  Ergo, defendant's Remand Results should be affirmed, with an amended judgment entered accordingly.

Decided:  New York, New York
          July 6, 2007

                                    /s/ Thomas J. Aquilino, Jr.
                                         Senior Judge

AMENDED JUDGMENT

UNITED STATES COURT OF INTERNATIONAL TRADE

Thomas J. Aquilino, Jr., Senior Judge

- - - - - - - - - - - - - - - - - - - -x
MITTAL STEEL POINT LISAS LIMITED,      :

                Plaintiff,   :

        v.                     :   Court No. 02-00756

UNITED STATES,                         :

                Defendant.   :
- - - - - - - - - - - - - - - - - - - -x

    This court having entered a judgment of dismissal of this action pursuant to slip opinion 05-37, 29 CIT ___, 366 F.Supp.2d 1300 (2005); and the plaintiff having prosecuted an appeal therefrom; and the U.S. Court of Appeals for the Federal Circuit ("CAFC") having decided sub nom. Caribbean Ispat Ltd. v. United States, 450 F.3d 1336 (2006), to vacate that judgment of dismissal and remand this matter; and this court in slip opinion 06-151, 30 CIT ___ (Oct. 13, 2006), having read the mandate of the CAFC to require remand to the U.S. International Trade Commission ("ITC") to

> "make a specific causation determination and in that connection . . . directly address whether [other LTFV imports and/or fairly traded imports] would have replaced [Trinidad and Tobago's] imports without any beneficial effect on domestic producers",

quoting 450 F.3d at 1341, quoting from Bratsk Aluminum Smelter

Court No. 02-00756                                                  Page 2

v. United States, 444 F.3d 1369, 1375 (Fed.Cir. 2006); and the defendant having filed the Views of the Commission (Jan. 16, 2007) pursuant thereto; and this court, after due deliberation, having rendered a decision thereon;  Now therefore, in conformity with said decision, it is

    ORDERED, ADJUDGED and DECREED that the view of certain members of the ITC that determines that an industry in

> the United States is not materially injured or threatened with material injury by reason of imports of certain wire rod from Trinidad and Tobago that is sold in the United States at less than fair value

be, and it hereby is, affirmed.

Dated:  New York, New York
       July 6, 2007


                                   /s/ Thomas J. Aquilino, Jr.
                                        Senior Judge

# NOTICE OF ENTRY AND SERVICE

      This is a notice that an order or judgment was entered in the docket of this action, and was served upon the parties on the date shown below.

      Service was made by depositing a copy of this order or judgment, together with any papers required by USCIT Rule 79(c), in a securely closed envelope, proper postage attached, in a United States mail receptacle at One Federal Plaza, New York, New York 10278 and addressed to the attorney of record for each party at the address on the official docket in this action, except that service upon the United States was made by personally delivering a copy to the Attorney-In-Charge, International Trade Field Office, Civil Division, United States Department of Justice, 26 Federal Plaza, New York, New York 10278 or to a clerical employee designated, by the Attorney-In-Charge in a writing filed with the clerk of the court.

or

      Service was made electronically, by the Court's CM/ECF system, upon those parties that have filed a Notice of Consent to Electronic Service.

      Tina Potuto Kimble
      Clerk of the Court

Date: _____   By: _____
                                                                                             Deputy Clerk